UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 4/5/2024
```

———————————————————————————x

NEW HAMPSHIRE INSURANCE COMPANY,

        Plaintiff,

        -against-                     No. 22-CV-05968 (CM)(GS)

TRAVELERS INDEMNITY COMPANY,

        Defendant.

———————————————————————————x

## MEMORANDUM DECISION AND ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

McMahon, J.:

    Before the Court is Defendant Travelers Indemnity Company's ("Travelers") motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, asking that the Court (1) declare that Plaintiff New Hampshire Insurance Company ("New Hampshire") is not entitled to a defense or indemnity from Travelers, and (2) dismiss the complaint in its entirety. (Dkt. No. 30 at 1).

    New Hampshire has opposed Travelers' motion for summary judgment and filed a cross motion for partial summary judgment. (Dkt. No. 38). New Hampshire requests that the Court declare that (1) New Hampshire is entitled to a defense and indemnity from Travelers, (2) third parties NYU Hospitals Center ("NYU") and Turner Construction Company ("Turner") qualify as additional insured under Travelers' general liability insurance policy with third parties E-J Electric

Installation Company and E-J Power, LLC (collectively, "E-J"); and (3) Travelers' coverage for NYU and Turner is primary to New Hampshire's. (*Id.* at 1-2).

For the reasons that follow, New Hampshire's cross motion for is DENIED; Travelers' motion is GRANTED.

## STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

### I.   The NYU and Turner Contract

In June 2013, NYU hired Turner to act as the construction manager for a construction project located at the NYU Medical Center at 34th Street between 1st Avenue and Franklin D. Roosevelt East River Drive, New York, NY (the "Kimmel Pavilion"). (Dkt. No. 33-7). Under the contract, Turner was responsible for the development, implementation and enforcement of a "comprehensive safety plan and comprehensive safety procedures for the [entire work site]." *Id.* at pp. T003435-6. Turner's safety plan required Turner to ensure that holes greater than two inches were "properly covered and labeled," to make sure floor openings were secured, to use a guardrail system to protect openings greater than 18" x 18" and to "conduct inspections of the workplace" for hazards. (Dkt. No. 33-9 at pp. T004501, 4526 and 4563). Additionally, the NYU-Turner contract's "Safety Project Manual" provision required Turner to: "use a separate building entrance for material deliveries"; "protect the entrance(s) to each job site against unauthorized entry"; keep "[a]ppropriate doors to site entry/entries and egress paths wide and unobstructed"; make sure that "[t]emporary pedestrian walkways . . . be at least five (5) feet in width, artificially lit and kept free of tripping and other hazards"; conduct "daily" inspections of "excavations" for "hazards"; and otherwise "meet minimum safety, health and equipment requirements." (Dkt. No. 33-7 at pp. T003574-577, 3581 and 3651). Finally, Turner was also responsible for determining

---

[1] Unless specifically noted, all facts in this section are undisputed.

2

and monitoring the location of the worksite's entrance and exit points and created a daily site plan showing those areas. (Dkt. No. 33-16 at pp. 9, 23-30, 101-03).

## II.     The New Hampshire Policy

New Hampshire had a general liability owner-controlled insurance policy with NYU. (Dkt. No. 33-6). The policy covered bodily injury caused by accident between December 6, 2014 to April 6, 2019. *Id.* Turner qualified as an additional insured on the policy. (*Id.* at 75; Dkt. No. 33-7 at § 11.3.6; § 11.6.1).

## III.     The E-J and Turner Subcontract

On April 11, 2014, E-J and Turner entered into a subcontract for electrical installation work at the Kimmel Pavilion. (Dkt. No. 33-10). The work encompassed the wiring, rigging, and installation of electrical components (e.g. lighting, security systems, IT and telecom systems, etc.) at the Kimmel Pavilion. *Id.* at 47-51. There is nothing in the E-J/Turner Subcontract that obligated E-J to maintain the entryways, ingresses or egresses to the work site in any manner, shape or form.

The subcontract required that E-J obtain commercial general liability insurance and that E-J name Turner and NYU as additional insureds under the policy. (Dkt. No. 39 at ¶12). The parties agreed that "all insurance, whether issued on a primary or excess basis, afforded the additional insureds shall be primary insurance to any other insurance available to the additional insureds." (Dkt. No. 33-13, Art. XXIV, ¶ B.).

E-J agreed that "the prevention of accidents to workmen and property engaged upon or in the vicinity of the Work is its responsibility . . . ." (*Id.* at Art. XXII).

## IV.     The Travelers Policy

Travelers issued E-J a commercial general liability policy. (Dkt. No. 33-1). The policy covered bodily injury, property damage and personal injury "caused by" E-J's acts or omissions,

or the acts or omissions of those acting on E-J's behalf. *Id.* at 36. The policy was in effect from March 31, 2016 to March 31, 2017. *Id.* at 3. The policy covered as an additional insured, "Any person or organization [E-J] agree[s] in a 'written contract requiring insurance' to include as an additional insured on this Coverage Part; and has not been added as an additional insured for the same project by attachment of an endorsement under this Coverage Part which includes such person or organization in the endorsement's schedule." *Id.* at 36. The additional insureds were only covered for liability for bodily injury, property damage, or personal injury, and only "to the extent that, the injury or damage is caused by acts or omissions of [E-J] or [E-J's] subcontractor in the performance of '[E-J's] work' to which the 'written contract requiring insurance' applies;" and "the person or organization does not qualify as an additional insured with respect to the independent acts or omissions of such person or organization." *Id.*[2]

The policy defined "Written contract requiring insurance" to mean "that part of any written contract or agreement under which [E-J is] required to include a person or organization as an additional insured on this Coverage Part, provided that the 'bodily injury' and 'property damage' occurs, and the 'personal injury' is caused by an offense committed, during the policy period and after the signing and execution of the contract or agreement by [E-J]; and while that part of the contract or agreement is in effect." *Id.* at 44.

In addition, the policy provides that if the "written contract requiring insurance" requires that the insurance "apply on a primary basis or a primary and noncontributory basis, this insurance is primary to other insurance available to the additional insured under which that person or organization qualifies as a named insured, and [Travelers] will not share with that other insurance." *Id.* at 37.

---

[2] Under E-J's policy, there are two other instances where liability can apply to an additional insured, but the parties agree that these instances are inapplicable to the present dispute.

## V.    LoPalo's Accident

On February 6, 2017, E-J electrician Joseph LoPalo was allegedly injured while working at the Kimmel Pavilion. (Dkt. No. 31 at ¶¶14-16). While the court generally uses the parties' Rule 56.1 statements as its guide to the undisputed facts, in the present case, neither party's statement provides much detail about how LoPalo came to be hurt. Accordingly, the court has had to dig through the evidentiary record to discern the relevant circumstances. For the details of the accident, the court primarily relies on the testimony of LoPalo, the relevant parts of which remain unrebutted and undisputed in the evidentiary record.

On the day of his injury, LoPalo was delivering materials to other E-J employees who were performing electrical work at the Kimmel Pavilion. (Dkt. No. 33-14 at 54-56). Some of these materials were contained in a supply container, which was located outside of the Kimmel Pavilion structure. *Id.* at 55. Consequently, LoPalo had to travel back and forth from the supply container to E-J's "job areas" in order to deliver the materials. *Id.* at 59.

On the day of LoPalo's injury, an E-J electrician, Justin Acurie, was working outside of the structure. *Id.* at 64-67. The other E-J employees were working on the upper floors of the Kimmel Pavilion. *Id.*

After lunch, LoPalo delivered materials to E-J workers on the seventh floor of the Kimmel Pavilion. *Id.* at 66. After LoPalo completed his delivery, an E-J foreman told LoPalo that Acurie needed a box of straps from the supply container. *Id.* at 65.

Although both the supply container and Acurie were located outside and approximately 75 feet apart, LoPalo had to take a much longer route to deliver the supplies. *Id.* at 67-70. This was because the work site was covered with fencing and barriers so that workers could follow safe

pathways when traveling around outside. *Id.* at 71. Consequently, LoPalo had to first enter the Kimmel Pavilion and then exit outside again to reach Acurie. *Id.* at 69.

LoPalo gathered the box of straps for Acurie and began his delivery route, walking through the Kimmel Pavilion. *Id.* As he was walking through the exit door to go back outside, LoPalo stepped out onto a walkway that was connected to the building. *Id.* at 71-72. This walkway included an unsecured plank, which was covering a trench dug into the ground. *Id.* As LoPalo stepped on the plank, the plank shifted and he fell into the trench, injuring himself. *Id.*

After four years of discovery in the underlying action, there is no evidence of any negligence on LoPalo's part for the accident, nor do the parties make any arguments to the contrary.

Travelers' Rule 56.1 statement (Dkt. No. 31) contains two separate assertions of material fact which New Hampshire "disputes." First, Travelers asserts that E-J was not performing any work in the area at the time of LoPalo's injury. (Dkt. No. 33-17, at 43-44). Second, Travelers asserts that E-J did not install the subject plank or walkway and never had control over either. *Id.* at 81-82, 104-05. Both assertions rely on the testimony of E-J's foreman at the time of the accident, Kevin Grandon.

New Hampshire does not offer any counterstatements in rebuttal to these assertions, but instead "disputes" them as "self-serving." But it is New Hampshire's "disputation" of this evidence that is self-serving. New Hampshire offers no evidence to rebut Travelers' assertions, nor has it provided any evidence that would cast doubt on Grandon's credibility. Additionally, Grandon's testimony that E-J performed work somewhere on the ground floor of the Kimmel Pavilion at some undefined time on February 6th is consistent with his testimony that E-J was not working in the

area where LoPalo's fell (a ground floor exit door and attached outdoor walkway) at the time of the injury's occurrence.

## VI.    The Underlying Action

On June 8, 2017, LoPalo sued NYU and Turner in the New York State Supreme Court. *See Joseph LoPalo v. NYU Langone Medical Center, NYU Hospitals Center and Turner Construction Company*, Index No. 151524/12017, (N.Y. Sup. Ct. N.Y. Cnty.) (the "Underlying Action"). LoPalo asserts claims based on common law negligence as well as New York Labor Law §§ 240, 241(6) and 200. (Dkt. No. 31 at ¶24). LoPalo alleges the accident "was caused solely and wholly by reason of the negligence, carelessness and recklessness of [NYU and Turner], their contractors, agents and employees who were negligent in the ownership, operation, management and control of the [premises]." (Dkt. No. 31-2 at 3-4). Specifically, LoPalo claims that:

> While Plaintiff was lawfully performing his duties, he was caused to fall into an unprotected, uncovered opening/trench that was in dangerous, hazardous and reckless conditions. Defendants, their contractors, agents and employees failed to provide proper access to and from work areas; further, failed to provide proper ramps and runways that were properly constructed, placed, operated and maintained for the workers; further, allowed dangerous and/or hazardous opening to remain and exist in a walkway, platform and designated runway causing dangerous and/or hazardous work conditions; further, caused tripping hazards and obstructions and conditions that lead to tripping and/or falling; further, failed to cover unattended trenches; further, failed to have warning signs, barricades, cones and other safety devices thereat; further, failed to provide runways that were properly constructed, placed, operated and maintained; further, failed to have proper planking that was secured but jointed in a proper and orderly manner; further, violated Sections 200, 240 and 241(6) of the Labor Law of the State of New York, Rule 23 of the Industrial Code of the State of New York . . . and was otherwise negligent, careless and reckless causing plaintiff to sustain serious and severe injuries.

(*Id.* at 4).

NYU and Turner thereafter filed a third-party complaint (the "First Third-Party Complaint") against E-J with claims for contribution, indemnification and breach of contract for failing to procure insurance. (Dkt. No. 31 at ¶30). In its Answer to the First Third-Party Complaint,

E-J asserted counterclaims for common-law indemnification and contribution. (Dkt. No. 1-4). On May 26, 2021, a second third-party action was filed by E-J seeking common-law indemnity and contribution as against Posillico Civil, Inc., and Donaldson Organization. (Dkt. No. 1-5). [3]

New Hampshire is currently defending NYU and Turner but has demanded that Travelers defend and indemnify NYU and Turner in the Underlying Action, (Dkt. No. 33-4), which Travelers has refused to do. (Dkt. No. 33-5).

**B.     Procedural Posture**

New Hampshire filed this lawsuit on July 13, 2022, seeking declaratory relief and reimbursement of its expenses in paying for NYU and Turner's trial defense. (Dkt. No. 1)

New Hampshire alleges that the accident in the Underlying Action falls within Travelers' policy with E-J. *Id.* at ¶55. New Hampshire also alleges that Travelers' coverage obligations are primary, while its are excess to the Travelers' policy. *Id.* at ¶48. Thus, New Hampshire seeks a declaration that Travelers owes NYU and Turner in the Underlying Action both a duty to defend and a duty to indemnify. *Id.* at ¶2. New Hampshire also seeks to recover whatever money it has thus far paid to defend NYU and Turner in the Underlying Action. *Id.* at ¶¶64-71.

On October 12, 2023, Travelers moved for summary judgment on the issue of its duty to defend NYU and Turner in the Underlying Action. (Dkt. No. 30). Travelers argues that the evidence shows that E-J could not have proximately caused the accident described in the underlying complaint, so Travelers does not owe a duty to defend or indemnify under its policy with E-J. (Dkt. No. 34 at 1-2). Travelers asks that the Court dismiss New Hampshire's complaint in its entirety. *Id.* at 17.

---

[3] The second third-party action is irrelevant to the present dispute.

New Hampshire filed its own cross motion for partial summary judgment on November 15, 2023. (Dkt. No. 38). New Hampshire claims that the allegations and extrinsic facts in the Underlying Action triggered Travelers's duty to defend, since there is a reasonable probability that the accident was "caused by" the acts or omissions of E-J. (Dkt. No. 41 at 2-3). New Hampshire also seeks summary judgment on the issues of whether NYU and Turner qualify as additional insureds under the Travelers Policy and which coverage is primary and which is excess. *Id.* at 1.

## LEGAL STANDARD

Summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" "if it might affect the outcome of the suit under the governing law." *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020). The relevant inquiry on application for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

A court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial. *Westinghouse Elec. Corp. v. N.Y.C. Transit Auth.*, 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there will be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original). "Uncertainty as to the true state of any material fact defeats the motion." *U.S. v. One Tintoretto Painting Entitled The Holy Fam. With Saint Catherine & Honored Donor*, 691 F.2d 603, 606 (2d Cir. 1982).

The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. Fed. R. Civ. P. 56(c)(1). "Courts must construe the evidence and draw all reasonable inferences in the non-moving party's favor." *United Specialty Ins. Co. v. JD Com. Builders Inc.*, No. 18-cv-6735 (CM), 2020 WL 49017661, at *3 (S.D.N.Y. Aug. 20, 2020).

"The same standard applies where, as here, the parties filed cross-motions for summary judgment." *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Id.*

## DISCUSSION

### I.    Travelers Does Not Owe NYU and Turner a Duty to Defend or Indemnify

Travelers' policy states, in relevant part, that it insures E-J "Only with respect to liability for 'bodily injury', 'property damage' or 'personal injury' . . . . caused by acts or omissions of [E-J] or [E-J's] subcontractor in the performance of [E-J's] work [for Turner]." (Dkt. No. 33-1 at 36).

New Hampshire argues that the policy has a reasonable possibility of covering the underlying incident, because the allegations in the LoPalo complaint and the First Third-Party Complaint against E-J raise a reasonable possibility of additional insured coverage under the Travelers Policy. New Hampshire also argues that the extrinsic facts suggest that E-J's acts or omissions in fulfilling its contractual safety obligations at the Kimmel Pavilion could reasonably have been a proximate cause of LoPalo's alleged accident.

Travelers argues that the policy does not insure the underlying accident as both the underlying complaint's allegations and the extrinsic evidence all point to NYU and Turner – not E-J – as the proximate cause of the accident.

10

A.    **NYU and Turner Qualify as Additional Insureds Under the Travelers Policy**

New Hampshire contends, and Travelers do not dispute, that NYU and Turner qualify as additional insureds under the Travelers Policy. (Dkt. No. 33-1, at 36; Dkt. No. 33-10 at ¶ 1.b.). The court agrees.

B.    **There Is No Reasonable Possibility That Any Act or Omission of E-J Was a Proximate Cause of LoPalo's Injuries**

Whether Travelers has a duty to defend turns on whether the allegations and extrinsic facts in the Underlying Action triggered such a duty.

Under New York law, which the parties agree applies, an insurer's duty to defend its policyholders is "exceedingly broad." *Atl. Ave. Sixteen AD, Inc. v. Valley Forge Ins. Co.*, 56 N.Y.S.3d 207, 209 (N.Y. App. Div. 2017). If there is a "reasonable possibility of coverage" then the insurer "will be called upon to provide a defense . . . ." *Euchner-USA, Inc. v. Hartford Cas. Ins. Co.*, 754 F.3d 136, 141 (2d Cir. 2014). "An insurer is relieved of the duty to defend only if 'there is no possible factual or legal basis on which [the insurer] might eventually be held to be obligated to indemnify [the insured] under any provision of the insurance policy'" *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 115 (2d Cir. 2005) (*quoting Servidone Constr. Corp. v. Sec. Ins. Co. of Hartford*, 64 N.Y.2d 419, 424 (1985)).

A duty to defend is triggered one of two ways. First, the duty may be triggered in the allegations within the underlying complaint. *BP A.C. Corp. v. One Beacon Ins. Grp.*, 8 N.Y.3d 708, 714 (N.Y. 2007). Where the allegations complaint potentially gives rise to a covered claim, the duty is triggered even if the allegations are false or groundless. *Frontier Insulation Contrs. v. Merchs. Mut. Ins. Co.*, 91 N.Y.2d 169, 175 (1997); *Century 21, Inc. v. Diamond State Ins.*, 442 F.3d 79, 82 (2d Cir. 2006).

Second, when a complaint does not suggest a possibility of coverage, an insurer may still have a duty to defend if facts outside the complaint suggest the claim is within the insurance policy's scope, and the insurer is aware of such facts. *Wausau Underwriters Ins. Co. v. Old Republic Gen. Ins. Co.*, 122 F. Supp. 3d 44, 49 (S.D.N.Y. 2015).

In summation, "Whether an insurer has a duty to defend turns on (1) the scope of the coverage it has agreed to provide; and (2) whether the complaint or the facts available to the insurer create a possible factual or legal basis on which the duty to defend may attach." *Zurich Am. Ins. Co. v. XL Ins. Am., Inc.*, 547 F. Supp. 3d 381, 394 (S.D.N.Y. 2021).

Travelers contends that there is no genuine issue as to whether LoPalo's injuries were "caused by" E-J's acts or omissions. Courts in this Circuit have held that the phrase "caused by" means proximate causation. *Certain Underwriters at Lloyd's, London v. Travelers Cas. Ins. Co. of Am.*, 664 F. Supp. 3d 288, 292 (E.D.N.Y. 2023) (*citing Burlington Ins. Co. v. N.Y.C. Tr. Auth.*, 29 N.Y.3d 313, 322 (2017)). "To make a *prima facie* showing of proximate cause, a plaintiff must demonstrate that the defendant's negligence was a 'substantial cause' of the events creating the injury. . . . A finding of proximate cause 'need not be based on absolute certitude or exclude every other possible cause of injury.'" *Was NJ-2, LLC v. JFB Const. & Dev.*, 111 F. Supp. 3d 434, 457 (S.D.N.Y. 2015) (internal citations omitted) (*quoting Equitable Life Assur. Soc. v. Nico Constr. Co.*, 245 A.D.2d 194, 196 (N.Y. App. Div. 1997)).

### i.     The Possibility That E-J Was a Proximate Cause of LoPalo's Injuries Cannot Be Discerned from Anything in the Underlying Complaint

Looking at the four corners of the underlying complaint, there is nothing to suggest a reasonable possibility that E-J was the proximate cause of LoPalo's injury. LoPalo alleges that the accident "was caused solely and wholly by reason of the negligence, carelessness and recklessness of [NYU and Turner], *their contractors*, agents and employees who were negligent in the

ownership, operation, management and control of the [premises]." *Id.* at 3-4 (emphasis added). When the entire pleading is analyzed, it pleads no facts tending to suggest any reasonable possibility that any action of E-J's was the proximate cause of LoPalo's injury. *See Travelers Indem. Co. v. Accredited Sur. & Cas. Co.*, No. 21-CV-03412-CM, 2022 WL 16722107, at *5 (S.D.N.Y. Nov. 4, 2022). The pleading specifically alleges that NYU and Turner and their contractors failed to provide safe access to the worksite, and negligently installed and maintained the walkway on which LoPalo fell.

These factual allegations are a far cry from those in cases where courts in this Circuit have held that an underlying complaint raises a reasonable possibility of coverage. *See, e.g., Liberty Mut. Ins. Co. v. N.Y. Marine & Gen. Ins. Co.*, 505 F. Supp. 3d 260, 272 (S.D.N.Y. 2020); *All State Interior Demolition Inc. v. Scottsdale Ins. Co.*, 168 A.D.3d 612 (N.Y. App. Div. 2019). In *Liberty*, the court found the underlying complaint raised a possibility of coverage where it (1) named the insured party as a defendant; and (2) alleged injuries resulting from construction conditions in an area where the insured party was the only party carrying out construction work. *Id.* at 272. And in *All State Interior*, the court found the underlying complaint raised a possibility of coverage where the insured party was conducting demolition at the injury site and the underlying complaint alleged that the "plaintiff was injured when he stepped on construction debris and materials consisting of concrete and demolition remains." *Id.* at 613 (internal quotation marks omitted).

The only allegation in the underlying complaint that even allegedly implicates E-J—the reference to non-specific "contactors"—is simply too vague and conclusory to raise a reasonable possibility that any action of E-J's caused LoPalo's injury. *See Stamford Wallpaper Co. v. TIG Ins.*, 138 F.3d 75, 81 (2d Cir. 1998) ("we will not hypothesize or imagine episodes or events that cannot be found among the allegations, and cannot reasonably be deduced from them."). This is

especially so since Turner was solely responsible, pursuant to the terms of its contract with NYU, for constructing and maintaining safe ingress and egress to the Kimmel Pavilion – and LoPalo was injured when he fell while trying to exit the building, many floors below where E-J was working at the time.

However, the underlying complaint's failure to level allegations against E-J is not dispositive of the duty to defend. *Charter Oak Fire Ins. Co. v. Zurich Am. Ins. Co.*, 462 F. Supp. 3d 317, 324 (S.D.N.Y. 2020). The Court must also consider the extrinsic circumstances surrounding the accident in deciding whether Travelers had a duty to defend – especially where, as here, LoPalo is statutorily barred from suing his employer.

### ii.    The Possibility That E-J Was a Proximate Cause of LoPalo's Injuries Cannot Be Discerned from Anything in the Third-Party Complaint

"[A]lthough the underlying complaint is the significant and usual touchstone for determining an insurer's duty to defend, its allegations are not controlling, and it must be considered alongside the other state court pleadings, such as bills of particulars, stipulations, and, as relevant here, third-party complaints." *U.S. Specialty Ins. Co.*, 2023 WL 6162409, *8 (S.D.N.Y. Sep. 21, 2023) (internal citations and quotations omitted).

Turning to NYU and Turner's third-party complaint, there is nothing *factual* therein to suggest a reasonable possibility that E-J was the proximate cause of LoPalo's injury.

New Hampshire argues that Travelers' duty to defend is triggered based on the allegations of New Hampshire's First Third-Party Complaint in the Underlying Action. Traveler argues that the allegations contained therein are conclusory and thus cannot trigger the requested coverage.

"[T]he mere fact that a third-party complaint was filed does not automatically trigger [a party's] duty to defend." *New York Marine & Gen. Ins. Co. v. Travelers Prop. Cas. Co. of Am.*, 632 F. Supp. 3d 303, 308 (S.D.N.Y. 2022). "Instead, the Court must look at the *facts* that are

pleaded in the Underlying Third-Party Complaint, not the conclusory assertions, to determine if they 'suggest a *reasonable* possibility of coverage.'" *Id.* (*quoting Euchner-USA*, 754 F.3d at 141) (emphases in original) (internal citation omitted).

The First Third-Party Complaint includes no *factual* allegations suggesting that E-J was at fault. (*See* Dkt. No. 33-3). Rather, it merely asserts – in conclusory fashion – that the claimed injury was "due to the primary and active carelessness, recklessness and negligence and/or negligent acts or omissions by [E-J] . . . ." (*Id.* at ¶¶ 25, 28). The First Third-Party Complaint does not specify what "acts" or "omissions" those might be; nor does it offer a single fact in support of its claim.

"[C]onclusory characterizations" of conduct as "negligence," without more, is insufficient to trigger coverage. *Sphere Drake Ins. Co. v. 72 Centre Ave. Corp.*, 238 A.D.2d 574, 576 (2d Dep't 1997); *Monter v. CNA Ins. Companies*, 202 A.D.2d 405, 406 (2d Dep't 1994). Accordingly, since there are no relevant *facts* pled in the First Third-Party Complaint, the complaint does not provide any evidence suggesting a reasonable possibility that E-J was the proximate cause of LoPalo's injury. *See, e.g., New York Marine*, 632 F. Supp. 3d at 308.

### iii.    The Remaining Extrinsic Evidence Does Not Give Rise to a Reasonable Possibility That E-J Was a Proximate Cause of LoPalo's Injuries.

"[A]n insurer may have a duty to defend irrespective of what is contained in the complaint[s] if there is extrinsic evidence showing that 'the insurer had actual knowledge of facts establishing a reasonable possibility of coverage.'" *Travelers Prop. Cas. Co. of Am. v. Hudson Excess Ins. Co.*, 660 F. Supp. 3d 187, 193 (S.D.N.Y. 2023) (*quoting Frontier*, 91 N.Y.2d at 175).

New Hampshire argues that the subcontract between E-J and Turner contains a safety provision, which in and of itself raises a reasonable possibility that E-J's negligence was the proximate cause of the underlying injuries.

Travelers argues that the remaining extrinsic evidence shows the accident happened because of circumstances that were solely the responsibility of NYU and Turner, and so resulted from NYU and Turner's own "independent acts or omissions."

The E-J/Turner subcontract dictates that E-J has responsibility for the "prevention of accidents to workmen and property *engaged upon or in the vicinity of the Work*." (Dkt. No. 33-10 at 16)(emphasis added). The subcontract defines "Work" as "Electrical Core & Shell" work. *Id.* at 4. E-J's foreman Kevin Grandon described the scope of E-J's work at the Kimmel Pavilion as "All the electrical, everything from electrical distribution to the electric closets up to the cogent generators. We just didn't have fit-out of floors." (Dkt. No. 33-17 at 23).

Accordingly, if LoPalo was "engaged upon or working in the vicinity of" E-J's electrical work when the accident occurred, extrinsic facts would raise a reasonable possibility that E-J's negligence was the proximate cause of LoPalo's injuries. However, the entirety of the relevant evidence shows that this was not the case.

Grandon testified that E-J was not performing *any* work in the accident area on the date of LoPalo's injury. (Dkt. No. 33-17, at 43-44). He testified, without contradiction, that the accident occurred at an exit door (i.e., on the ground floor), while E-J was working that day on the seventh floor of the Kimmel Pavilion, except for one electrician (Justin Acurie), who was stationed outside the building and away from the accident area. (*Id.* at 43-44; Dkt. No. 33-14 at 64-65). LoPalo confirmed in his deposition that he was injured while walking out of an exit door on the first floor; at the time of the injury he was on the way to deliver straps to Acurie's "job area" outside the Pavilion. (Dkt. No. 33-14 at 55, 59, 65-67).

New Hampshire does not rebut any of this evidence, nor does it argue that LoPalo was acting within the scope of "Work" as it is defined in the E-J/Turner subcontract. Instead New

Hampshire argues that the mere fact that E-J had safety responsibility over *some portion* of the worksite is sufficient to create a reasonable possibility that E-J's negligence proximately caused the accident, regardless of where the accident occurred. In support of its argument, New Hampshire offers evidence that E-J had a safety manager at the work site at the time of the accident, that the safety manager and E-J's foremen performed daily inspections of E-J's work areas for unsafe conditions, and that E-J had the authority to stop E-J employees from performing work in unsafe areas.

Courts have universally rejected New Hampshire's argument. "The duty to defend is triggered when the insured party has safety obligations *at the injury site*." *Travelers Indem*, 2022 WL 16722107, at *6 (emphasis added) (*citing U.S. Underwriters Ins. Co. v. Image By J & K, LLC*, 335 F. Supp. 3d 321, 331 (E.D.N.Y. 2018)). "[I]f the area of injury was solely one party's safety responsibility, and the insured party simply sends the injured person to that area, the insured party is not liable." *Id.* (collecting cases). The evidence clearly shows that E-J had no safety obligations at the injury site. The location of the accident was at an exit door and walkway apart from where E-J's employees were conducting their electrical work. No E-J employees were working in the area that LoPalo fell. (Dkt. No. 33-17 at 43-44). E-J was "simply send[ing]" LoPalo from "the vicinity of E-J's electrical work" through the injury site in order to pick up and deliver materials. *Id.*

Nor is it relevant that E-J had safety obligations with respect to its own work areas, as LoPalo was injured in an area separate from E-J's work areas. As per the NYU-Turner contract, Turner had sole and very specific responsibility for maintaining safe ingress and egress routes at the worksite. (*See* Dkt. No. 33-7 at pp. T003574-577, 3581 and 3651). And the testimony of

Ralph Dillon, Turner's superintendent, confirms that Turner consistently undertook those responsibilities at the work site. (Dkt. No. 33-16 at pp. 9, 23-30, 101-03).

Accordingly, New Hampshire's evidence is insufficient to trigger coverage.

Two cases are particularly instructive here.

In *Pioneer Cent. Sch. Dist. v. Preferred Mut. Ins. Co.*, 165 A.D.3d 1646 (2018), a janitor employed by a janitorial service slipped on ice while working at a middle school. The contract between the janitorial service and the school listed the school as an additional insured, and so the school sought defense and indemnity in the janitor's suit against it. The New York Appellate Division held that the janitorial service was entitled to summary judgment on the school's claims for defense and indemnity. The school contended that the janitorial service caused the accident because it instructed the janitor to leave the school through a door near where she slipped on the ice. The court disagreed. The janitorial service "merely furnished the occasion for the injury" by fortuitously placing the janitor "in a location or position in which an alleged separate instance of negligence acted independently upon her to produce harm." *Pioneer*, 165 A.D.3d at 1647 (cleaned up) (*quoting Hain v. Jamison*, 68 N.E.3d 1233, 1240 (N.Y. 2016)). Because the janitorial service "was not responsible for clearing ice and snow," the school, and not the janitorial service, proximately caused her injuries. *Id.* Thus, there was no reasonable possibility of coverage, and the janitorial service's insurer was not required to defend the school in the janitor's suit.

In *Ohio Sec. Ins. Co. v. Travelers Indem. Co. of Connecticut*, No. 19-CV-1355 (AJN), 2021 WL 797670 (S.D.N.Y. Mar. 1, 2021), two insurers sparred over who would bear responsibility for a personal injury lawsuit filed by a worker at a shared job site. The plaintiff in the underlying action tripped and fell while working as a heating, ventilation, and air

conditioning ("HVAC") installer at a construction project. The contract between the HVAC

subcontractor and the construction manager listed the manager as an additional insured, and so

the manager sought defense and indemnity in the worker's suit against it. My colleague, Judge

Nathan, held that the HVAC subcontractor was entitled to summary judgment on the

construction manager's claims for defense and indemnity. The court found that the evidence was

clear that the subcontractor "would have nothing to do with the placement or maintenance of

temporary floor coverings" where the injured worker tripped. *Id.* at *5. The court also found that

the relevant evidence did "not support the view that [the subcontractor] was responsible for

hazards at the worksite that it did not create." *Id.* Instead, the evidence showed that "other parties

were responsible for maintaining the worksite" where the worker was injured. *Id.* Thus, there

was no reasonable possibility of coverage, and the HVAC subcontractor's insurer was not

required to defend the construction manager in the worker's suit.

     As in *Pioneer* and *Ohio*, the unrebutted and undisputed evidence in this case establishes

that Turner – and not E-J – had safety responsibility over the accident area and the conditions

thereof. Turner was responsible for the development, implementation and enforcement of a

"comprehensive safety plan and comprehensive safety procedures for the [entire work site]."

(Dkt. No. 33-7 at pp. T003435-6). Turner's safety plan required Turner to ensure that holes

greater than two inches were "properly covered and labeled," to make sure floor openings were

secured, to use a guardrail system to protect openings greater than 18" x 18", and to "conduct

inspections of the workplace" for hazards. (Dkt. No. 33-9, at pp. T004501, 4526 and 4563).

Additionally, the NYU-Turner contract's "Safety Project Manual" provision required Turner to:

"use a separate building entrance for material deliveries"; "protect the entrance(s) to each job site

against unauthorized entry"; keep "[a]ppropriate doors to site entry/entries and egress paths wide

and unobstructed"; make sure that "[t]emporary pedestrian walkways . . . be at least five (5) feet in width, artificially lit and kept free of tripping and other hazards"; conduct "daily" inspections of "excavations" for "hazards"; and otherwise "meet minimum safety, health and equipment requirements." (Dkt. No. 33-7 at pp. T003574-577, 3581 and 3651). Finally, Turner was also responsible for determining and monitoring the location of the worksite's entrance and exit points and created a daily site plan showing those areas. (Dkt. No. 33-16 at pp. 9, 23-30, 101-03).

The allegations of LoPalo's underlying complaint are based entirely on defalcations in Turner's carrying out of its safety responsibilities. The complaint alleges that LoPalo was injured due to "an unprotected, uncovered opening/trench," (Dkt. No. 33-2 at 3), which – according to the responsibilities Turner established in its own Safety Plan – Turner was specifically required to cover, label, secure, and protect with guardrails. (Dkt. No. 33-9 at pp. T004501, 4526 and 4563). The underlying complaint also claims that the responsible parties "failed to provide proper access to and from work areas;" "failed to provide proper ramps and runways that were properly constructed, placed, operated and maintained for the workers"; "allowed dangerous and/or hazardous opening to remain and exist in a walkway, platform and designated runway"; "caused tripping hazards and obstruction"; "failed to have warning signs, barricades, cones and other safety devices"; and "failed to have proper planking that was secured but jointed in a proper and orderly manner." *Id.*

The evidence is clear that the E-J had nothing to do with the placement or maintenance of the plank and area where LoPalo tripped. (Dkt. No. 33-17 at 81-82, 104-05). The relevant evidence does not support the view that the E-J was responsible for hazards at the worksite that it did not create. Instead, the evidence shows that Turner was responsible for maintaining the worksite and conditions thereof where LoPalo was injured. And the underlying complaint's

allegations, when compared to the parties' respective safety responsibilities, point exclusively to Turner as the proximate cause of the accident.

Thus, nothing in the evidentiary record suggests a reasonable possibility that E-J proximately caused the claimed injury. Accordingly, Travelers has no duty to defend NYU and Turner in the Underlying Action.

Additionally, if there is no duty to defend, there can be no duty to indemnify. *See EAD Metallurgical, Inc. v. Aetna Cas. & Sur. Co.*, 905 F.2d 8, 11 (2d Cir. 1990).

Finally, as Travelers has no duty to defend or indemnity, Travelers' policy simply does not cover the accident at all, so it obviously is not primary to the New Hampshire policy.

## CONCLUSION

For the foregoing reasons, Travelers's motion for summary judgment is GRANTED. The complaint is dismissed in its entirety.

The clerk is directed to terminate the motions at Docket Numbers 30 and 38, and to terminate the case.

This constitutes the decision and order of the court. This is a written decision.


Dated: April 5, 2024

_____

U.S.D.J.


BY ECF TO ALL COUNSEL